Carl George SMITH, Jr.

v.

UNITED STATES of America.

Civ. A. No. 450–72–A–M.

United States District Court,
E. D. Virginia,
Alexandria Division.

May 10, 1974.

Carl George Smith, Jr., pro se.

David Hopkins, Asst. U. S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Carl George Smith, a federal prisoner, brings this action seeking post conviction relief under 28 U.S.C. § 2255. Through the course of this action Smith has presented to the Court several alleged grounds for relief. Some of these claims were found repetitive of claims which Smith had previously brought before the Court in Civil Action No. 311–70–A–M (E.D.Va. Alexandria Division); others have been disposed of on the merits in this action. A more extensive history of Smith's various attempts at post-conviction relief in this action, his previous § 2255 action, and other collateral proceedings, is contained in Smith v. United States, 364 F.Supp. 1145 (E. D.Va.1973), and in the addendum to this memorandum.

In a memorandum and order filed on September 20, 1973, the Court disposed of Smith's final claim pending in this action—an alleged suppression of exculpatory evidence by the prosecution in Smith's criminal trial—granting summary judgment to the respondent on that claim and dismissing the action. That decision is reported in Smith v. United States, 364 F.Supp. 1145 (E.D.Va.1973).

On September 28, 1973, Smith filed a pleading styled "Motion for Reconsideration." That motion having been filed within ten (10) days of the order disposing of Smith's final claim, to which the motion itself was addressed, it will be treated as a motion, pursuant to Rule 59(e), F.R.Civ.P., to alter or amend the judgment entered on September 20, 1973. It is that motion to which the present memorandum is addressed.

The criminal proceeding to which this and Smith's various other attempts at post conviction relief have been addressed was his conviction, upon a jury verdict, on October 10, 1969, for armed bank robbery. See United States v. Smith, Cr. No. 71–69–A (E.D.Va.). The relevant facts surrounding the bank robbery and Smith's ultimate conviction for that crime are summarized as follows:

On March 21, 1969, at approximately 7:00 p.m., the United Virginia Bank of Reston, Virginia was robbed by a man garbed in clothing including gloves, a ski mask and goggles so that his face and body were completely covered. The robber was armed with what was identified as a short, blue revolver. He escaped on foot from the bank with in excess of $10,000, including a certain number of marked one-hundred dollar bills, characterized as bait money. It was for this robbery that Smith was ultimately convicted.

The government's case against Smith rested entirely on circumstantial evidence. The evidence was, however, both considerable and convincing. It tied Smith to virtually all aspects of the robbery.

It appears that at the time of the robbery Smith was on parole under the sponsorship of a couple named Lundgren. Mrs. Lundgren testified that Smith had had conversations with her regarding the techniques of bank robbery and had informed her that the best way to rob a bank was to cover the body completely, using a ski-mask, goggles and gloves, to go behind the counter of the bank in order to get to big bills, and to escape on foot so that there would be no car which could be traced. In short, Smith described the almost exact set of circumstances which surrounded the actual robbery. Mrs. Lundgren further testified that her son had owned a ski mask, similar to the one which had been worn by the robber, which had not been found since Smith had ceased living with her family.

Much of the evidence went to the manner in which Carl George Smith and his wife had spent large sums of money, often in hundred dollar bills, subsequent to the robbery. By far the most important evidence concerned a deposit of $3,400 in hundred dollar bills made by Mrs. Smith. Federal investigators secured the possession of these bills after they had passed through several hands and discovered that several of the bait bills taken from the bank were among them. In addition, evidence disclosed that Smith and his wife had, during a short period following the robbery, made bank deposits and large expenditures totalling over $10,000, closely approximating the amount stolen. While Smith and his wife tried to explain at least some of these payments and deposits, their explanations were impeached by the fact that some of the deposits were made in banks located in areas distant from the Smith's residence and by the fact that some of them were made in the form of money orders payable to Smith from Edward Haywood, a name later identified as Smith's alias.

Additional evidence was presented to show that Smith and his wife lived in a home which was located, by road, approximately two miles from the bank in question. By a direct, walking route it was only one mile away. Smith, who was in excellent physical shape and looked to be much younger than his actual age of forty-five, admitted to being a long distance runner. He stated that in prison he had run approximately five miles every day. This evidence tended to link Smith with the athletic bank robber who escaped on foot.

Finally, the government presented evidence to the effect that Smith and his

wife had purchased a hand weapon on March 7, 1969. The gun was described as a short, blue revolver, which fit the description of the weapon carried by the robber.

With respect to his present motion, Smith asserts two grounds for requesting the Court to reconsider its order disposing of his suppression of evidence claim. First, he argues that the Court committed various errors of law in deciding the matter earlier. Second, he asserts there were additional items of allegedly suppressed evidence which have just come to his attention, and which had not been submitted to the Court for consideration in reference to its earlier decision.

With respect to the "additional items" of allegedly suppressed evidence, first raised after the Court's order of September 20th had been entered, the Court accepts as factual Smith's representation that the Fairfax County Police reports containing the information in question were not in Smith's possession prior to the earlier decision disposing of his suppression claim. Accordingly, the Court concludes that consideration of those additional items, at this late date, is justified.

I. The Governing Principles

First, with respect to Smith's various arguments as to the governing principles of law, the Court has reconsidered the matter and sets forth below what it considers to be the appropriate legal analysis.

There are three situations in which the suppression of evidence by the prosecution is an issue. First, there is the situation in which the government has deliberately withheld information which has been the subject of a request for disclosure by the defense. See, e. g. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, there is the situation in which the government has negligently failed to disclose information which has been the subject of a request for disclosure by the defense. See discussion in United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968). Finally, there is the situation in which the government has failed to volunteer information which is found to have been of such vital significance to the defense that the government will be held to have had an affirmative duty to make a disclosure even in the absence of a request. See, e. g., Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964).

■ A prerequisite to relief for the nondisclosure of required information is that the defense did not have independent knowledge of and access to the evidence in question at the time of trial. See Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1958); Thomas v. United States, 343 F.2d 49, 54 (9th Cir. 1965). Beyond that, the undisclosed information must be either *material* evidence or at least *useful* to the defense in preparing its case. See, Giles v. Maryland, *supra*, at 74, and at 98 (Fortas, J. concurring). Some cases indicate that the level of materiality or usefulness may vary according to the situation involved. See United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968); Kyle v. United States, 297 F.2d 507 (2d Cir. 1961). See also, Moore v. Illinois, 408 U.S. 786, 794–795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1971), which suggests that whether or not the undisclosed evidence had been the subject of a defense request is a factor to be considered. But, *cf.*, Brady v. State of Maryland, 373 U.S. 83, at 87 (1963) (suggesting that the prosecutor's good faith or bad faith in withholding the information should be irrelevant) and Giles v. Maryland, 386 U.S. 66, 73, 87 S. Ct. 793, 17 L.Ed.2d 737 (1967).

The suggestion in United States v. Keogh, *supra*, at 147, and Kyle v. United States, *supra*, at 513–515, is that the burden on the criminal defendant to demonstrate prejudice resulting from the non-disclosure of evidence in the government's possession should be less where it is found that the government

has deliberately suppressed requested information.

However, the Court is not here faced with the problem of deciding whether a lesser showing of prejudice is sufficient to warrant relief in the case of a deliberate suppression of requested information. In this case there was no request for discovery of the reports in question. It is therefore sufficient for the Court to take into account the standard applied in Barbee v. Warden, 331 F.2d 842, 847 (4th Cir. 1964), which case also involved the failure to disclose potentially exculpatory evidence where no request had been made.

■ Essentially, the issue was posed in *Barbee, supra,* at 847, as being whether there was a reasonable possibility that the undisclosed evidence might have nurtured a reasonable doubt as to guilt.[1] Of course, the undisclosed information need not go directly to the question of guilt. See Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). It is sufficient, for example, that the information might have been useful in challenging the credibility of a prosecution witness. See Giles v. Maryland, *supra,* at 73–74. Indeed, it may be sufficient that the undisclosed information, though not admissible into evidence, would have been somehow useful to the defense in structuring its case. *Cf.* Giles v. Maryland, *supra,* at 98 (Fortas, J. concurring).

■■ Nevertheless, the party claiming a suppression of evidence must be able to demonstrate how the information might have been used; and the requisite standard of materiality or usefulness expressed in *Barbee, supra,* at 847, must be met. In other words, the question is whether, considering the use to which the undisclosed evidence might have

been put, there is a reasonable possibility that such use could have affected the result reached at trial.

In its previous consideration of Smith's suppression claim, the Court noted that in the case of potentially exculpatory evidence which had been in the hands of government agents throughout, due diligence of counsel for the defense is not a prerequisite to relief. *Barbee, supra,* at p. 845. Beyond that, this Court stated that it considered:

. . . the appropriate standard to be applied in determining whether the evidence is of such vital importance that relief should be granted . . . is the standard applied with respect to after-acquired evidence. . . . That standard is whether the introduction of such evidence at trial would have been likely to have affected the result (footnote omitted).

Smith v. United States, 364 F.Supp. 1145, at 1149 (E.D.Va.1973).

*Cf.* Kyle v. United States, *supra,* at p. 512, where the *Berry* formulation was also used.

■ In other words, this Court, in its previous decision, considered that undisclosed information which had been in the government's possession at the time of trial but for which no request had been made by the defense should be viewed as a special variety of after-acquired evidence. The same degree of materiality or usefulness would be required for relief as for other after-acquired evidence. The relevant difference would be that due diligence by the defense counsel to discover the evidence would not be required under such circumstances. The justification for the latter distinction would be the government's partial culpability in failing to

---

1. The Court in *Barbee, supra,* at 847, analogized to the standard applied in Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963) with respect to improperly admitted evidence: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

In dealing with the matter at hand, the Court in *Barbee, supra,* at 847, concluded that: "The report might not have been proof of the defendant's innocence, but if its contents had been made known, it might well have nurtured, even generated, a reasonable doubt as to guilt."

disclose this highly relevant evidence or useful information, *sua sponte*. It was the question of due diligence by the defense counsel which had, indeed, been the focus of attention in Barbee v. Warden, *supra*, at p. 845.

Noting the variation in verbal formula used by this Court in its previous consideration of this matter from that used by the Court of Appeals in Barbee v. Warden, *supra*, at 847, the Court is not convinced that there is any real difference between the two. Even assuming the maximum advantage Smith could achieve through the difference in language, he can rest assured that the Court's present consideration of his claim will be according to the standard articulated in *Barbee, supra*, at 847.

▮ Smith, on the other hand, points to the standard applied in several cases decided by the Court of Appeals for the District of Columbia. See Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 297 (1966) ("evidence which . . . might have led the jury to entertain a reasonable doubt about [the defendant's] guilt"); Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209, 1212 (1967) (focus of the test is upon "the ultimate *possibility* of harm to the defendant"). It may be that the level of materiality required for relief in those cases was less than that suggested by the Court of Appeals for the Fourth Circuit in Barbee v. Warden, *supra*, at 847. However, it is the decisions of the Court of Appeals for the Fourth Circuit by which this Court is bound. In addition, the Court would draw attention to the Second Circuit's rejection of the D. C. Circuit standard in a case which also did not involve the deliberate suppression of requested information. United States v. Keogh, 391 F.2d 138 (2d Cir. 1968). The Court in *Keogh* noted the need to balance the possibility of prejudice to the criminal defendant against society's interest in the finality of judgments. In so doing it stated that:

> . . . To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties.

To reiterate, the standard which this Court applies, herein, is the standard articulated in Barbee v. Warden, *supra*, at p. 847.

## II. Application of the Standard

The Court's previous consideration of Smith's suppression claim, discussed in the memorandum decision of September 20, 1973, 364 F.Supp. 1145, related solely to information allegedly contained in the Fairfax County police reports which suggested that the suspect might have been a Negro youth.[2] As pointed out in the previous memorandum, Smith is a white male and was 45 years of age at the time of the bank robbery.

The Court rejected Smith's earlier claim for two reasons. First, the Court determined that, because of their doubtful credibility, these preliminary reports as to the suspect's age and race were not of such great importance that the prosecutor should be held to have had an affirmative duty to make a disclosure, even in the absence of a request by the defense. That determination, in turn, was based on the Court's conclusion that the introduction of this evidence at trial would not have been likely to have affected the result. Alternatively, the Court determined that the defense had been sufficiently aware of the information in question to preclude relief. *Cf.* Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1968); Thomas v. United States, 343 F.2d 49, 54 (9th Cir. 1965).

While Smith vehemently contests the first grounds upon which relief was de-

---

**2.** It should be noted from the outset that none of the reports in question contain written statements by any witness, so as to bring into play the provisions of 18 U.S.C. § 3500.

nied by arguing that the wrong standard was applied, the alternative grounds for the decision remain essentially unchallenged as to this first item of evidence.

■ Having reconsidered the first grounds on which relief was denied, and taking into consideration the standard of materiality expressed in Barbee v. Warden, *supra*, at 847, the Court again concludes that the information in question was not of such critical importance that the government should be held to have had an affirmative duty of disclosure, even in the absence of a request by the defense. In short, the evidence was of such doubtful credibility that it is *not* reasonably possible that had it been introduced at trial it would have nurtured a reasonable doubt as to Smith's guilt.

In this regard it should be pointed out that the Court's original conclusion, as to the credibility of the evidence, assumed the correctness of Smith's allegation that the reports contained a statement by one witness that the robber was "a slightly built Negro teenager." Since that time the Court has been supplied with a copy of the Fairfax County Police reports[3] and Smith's claim is considerably *weakened* by a review of those reports.

The reports *do not*, in fact, contain a categorical statement by any witness that the suspect was "a slightly built Negro teenager." According to the reports, all of the witnesses agreed that the suspect had been wearing clothes that covered virtually all parts of his body, including his face.[4] One witness (Ivan Hadala) [Hatala] did report that the suspect was a *"possible* Negro." (emphasis added). He did not state the basis for this conclusion. Another witness (Johnson) reported that "he thought *from the way the subject talked,* he *thought* (sic) him to be a Negro." (emphasis added). The latter witness

(Johnson) frankly conceded that he had not seen the suspect's skin at any time. On the other hand, at least two witnesses (Garner and Rodda) reported their belief that the suspect was white. Particularly interesting (considering the basis for witness Johnson's contrary suggestion) is the fact that one of those witnesses (Garner) arrived at the conclusion that the suspect was white because of "the tone and manner of his voice."

It is significant that the police officer (Loveless) who filed the primary report on the robbery concluded therein that the suspect was white. This officer (Loveless) had personally interviewed three of the witnesses. Two of the witnesses he interviewed (Ivan Hatala and Johnson) were the same two who had reported to other officers (Zohn and Mould respectively) that the suspect may have been a Negro. However, neither witness so indicated in the descriptions they gave to Officer Loveless. Moreover, Officer Loveless' over-all impression of the various reports taken was obviously to the contrary.

It is true that most of the witnesses reported the suspect to be young. At least three of the reports ranged between 16 and 19 years of age. Obviously, however, skin and facial characteristics had not been a factor in the conclusion reached by the various witnesses as to the suspect's age. As noted previously, all had agreed that the suspect had been wearing clothes which covered his entire body, including his face. Rather, it would appear that the conclusions reached as to the suspect's age had been based on the observation by most of these witnesses that the robber had a slim build and displayed great agility in moving about the bank. In this regard it should be noted that Smith himself had an athletic build, which gave him an appearance much younger than his ac-

---

3. A copy of the reports has been filed as an exhibit in this action.

4. Two of the witnesses (Garner and Johnson) could not recall whether the robber had

been wearing gloves. However, another witness (Z. Hatala) reported that the robber had, indeed, been wearing black gloves.

tual age of forty-five; and that he admitted to being a long distance runner. He stated that before his release from prison shortly before the robbery he had run approximately five miles a day.

Considering the steps taken by the robber to hide his identity and the various conflicts between the individual reports as to his race, the Court considers the conclusions drawn by the various witnesses as to the suspect's age and race to be nothing more than subjective impressions based on extremely unreliable criteria. As such, these preliminary reports were simply too speculative to have been of significant use to the defense. See Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1963) (Fortas, J. concurring). Any attempt by the defense to place this information into evidence would have been subject to vigorous credibility attacks by the prosecution.

On the other side of the coin, the prosecution made no attempt to abuse its exclusive position with respect to this information at trial, by using the testimony of the reporting witnesses to directly identify Smith as the robber, or by otherwise introducing testimony by those witnesses which was in any way inconsistent with their previous reports. The evidence would not, therefore, even have been useful to the defense for impeachment purposes or cross-examination. Cf. Giles v. Maryland, supra.

Indeed, the government did not offer testimony by any of the witnesses to the robbery establishing the suspect's race. The two witnesses who had suggested the suspect might have been a Negro (I. Hatala and Johnson) did not testify at trial at all. The only two witnesses to the robbery who did testify at trial (Rodda and Garner) did not testify as to the suspect's race. Tr. 71–69–A, 10/8/69, pp. 32–38, pp. 38–42.

As to the suspect's age, Garner openly stated at trial what she had told the police just after the robbery—that she had thought the robber to be young. Tr. Cr. No. 71–69–A, 10/8/69, at pp. 40–41. As to Rodda, the police reports indicate that although she had thought the suspect might be young, she had been unsure of that fact at the time of the report. On the witness stand, she did not testify at all as to the bank robber's age. Tr. Cr. No. 71–69–A, 10/8/69, at pp. 36, et seq.

In addition, this evidence, which Smith claims to have been suppressed, in no way rebuts the elements which the government presented to prove the charge against Smith. The evidence does not, for example, explain how Mrs. Smith got possession of the bait bills; nor does it explain any of the coincidences between the description Smith gave Mrs. Lundgren as to what he considered a perfect bank robbery and the actual robbery of the Reston bank.

In short, the Court is convinced that the evidence against Smith overwhelmingly supported his guilt and that there is no "reasonable possibility" that had the evidence here in question, regarding the suspect's age and race, been introduced at trial it would have affected the outcome. Cf. Barbee v. Warden, supra, at 847.

Finally, the Court reiterates that the alternative ground for the original decision herein remains unchallenged. That is, the defense counsel had been sufficiently aware of the early reports concerning the suspect's possible age and race to negate any potential prejudice resulting from the government's failure to make a sua sponte disclosure of this information. Smith v. United States, 364 F.Supp. 1145, 1149–1150 (1973). Cf. Rosenburg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L. Ed.2d 1304 (1958); Thomas v. United States, 343 F.2d 49, 54 (9th Cir. 1965).

III. Additional Items of Allegedly Suppressed Evidence

Turning to the second asserted grounds for reconsideration of his suppression claim, Smith has now brought to the Court's attention the following items of information which were also

**1252**

contained in the Fairfax County Police reports:

1. A report by one witness to the robbery (Garner) that the gun carried by the robber "was very old looking."[5]

2. A report by one witness to the robbery (I. Hatala) that the robber "seemed to be unfamiliar with the handling of a gun."[6]

3. Police officials' suspicions, just after the robbery, that a 1968 Mercury Cougar automobile, which had been reported as stolen from Dulles Airport on the date of the robbery, might have been involved in the bank robbery.[7]

4. A report by one Eleanor Sokolove, who was not a witness to the robbery itself, that shortly before the robbery she had seen one Kirby Yarborough, a Negro male who answered the general description that was given her of the bank robber, originally reported as a young, slender male between 5 ft. 7 in. and 5 ft. 9 in. tall, in the "Rathskeller," located across the street from the bank, and that he had been wearing a blue sweater.[8]

5. A report by one witness to the robbery (Carol Rodda) describing the bank robber (who virtually all the witnesses agreed had been wearing a blue ski mask), wherein she mentioned "that the eyes in the mask were outlined in red."[9]

■ As to the first two items noted, the Court has no difficulty concluding that the statements referred to are, on their face, simply too speculative to have been of any great use to the defense. *Cf.* Giles v. Maryland, *supra*, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (Fortas, J. concurring). The Court simply cannot conclude that the jury would have been much swayed by these statements concerning the description of the gun used and the robber's ability to handle a gun, coming as they did from laymen who were observing the incidents reported under the stress of an ongoing armed robbery, wherein the witness' own lives were endangered. Again, such statements would have been subject to vigorous credibility attacks by the prosecution. Moreover, regardless of Smith's ability to handle a gun under re-

---

5. The significance which Smith attaches to this report is the fact that in building its circumstantial case against Smith, the prosecution brought into evidence the fact that Smith had recently helped his wife to purchase a revolver (presumably *new*) which otherwise matched the description given by the various witnesses of the gun used by the bank robber. After the robbery, Smith's wife reported being unable to find the gun he had helped her to purchase.

6. Smith asserts that he could have put into evidence "testimony as to his prowness (sic) with a gun."

7. According to a newspaper account which Smith has submitted, the automobile in question was later recovered by the police 13 miles from the scene of the robbery. The significance which Smith attributes to this report is related to the fact that in building its circumstantial case against Smith, the prosecution theorized that Smith had fled the scene of the robbery on foot and ran to his place of residence one to two miles from the bank. It was brought out in evidence that Smith was an experienced long distance runner.

8. The significance which Smith attaches to this report is that by correlating it with the reports of several of the witnesses to the robbery that the robber was young and had been wearing a "blue turtleneck sweater" and the reports of two of the witnesses (discussed above) that the robber might have been a Negro, the defense might have been able to develop an alternate suspect for the crime.

9. The importance which Smith attaches to this item is that part of the circumstantial evidence against him at trial was his access to a ski mask owned by the Lundgren's son, with whom he had been residing some time prior to the robbery, and which was reported missing after the robbery. The mask to which Smith had access was claimed, at trial, to match, generally, the mask used in the robbery. Smith now asserts that the mask to which he had access did not have eyes, but "had an oblong shaped aperture to see through." He also asserts that the aperture was not "outlined in red." Petitioner's Memorandum to the Court filed on December 5, 1973.

laxed circumstances, it would not be surprising that assuming he was, in fact, the bank robber, the tensions of the moment would have caused him to appear nervous and inexperienced with a gun.

As to the third and fourth items noted, the indications are that these were simply preliminary investigative reports. *Cf.* Giles v. Maryland, *supra,* at 98 (Fortas, J. concurring); Moore v Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1971). There is nothing in the reports themselves which suggests that this preliminary information ever developed into anything in the way of concrete evidence relevant to the robbery. Indeed, with respect to the police suspicions regarding the possible use of the stolen automobile in connection with the robbery, the government has recently submitted an affidavit, by former Special Agent Crowder, which attests to the fact that nothing ever developed to establish such a link.

The Court is well aware that in the course of investigating a crime, law enforcement authorities may often report and check into a great variety of matters which ultimately prove to have absolutely no relevance to the crime under investigation. The Court simply does not consider that a prosecutor should be held to a duty of making a disclosure, sua sponte, of every "dead end" lead contained in the police investigative reports. See Giles v. Maryland, *supra,* at 98 (Fortas, J., concurring); Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1971); United States v. Keogh, 391 F.2d 138 (2d Cir. 1968).

As to the fifth item noted, it is true that Mrs. Lundgren did not describe the mask to which Smith had access and which was later found missing from her household as having had separate eye holes outlined in red. Tr. Cr. No. 71–69–A, 10/8/69, at pp. 131–32. However, her description of the mask to which Smith had access did not exclude that possibility. There is not, therefore, necessarily any discrepancy between the mask to which Smith was shown to have had access and the one which Mrs. Rodda had described as having been used in the robbery. Of course, it may be that Smith would be able to show at a hearing that such inconsistency did exist.

However, even assuming it could be proved that the mask which had later been found missing from the Lundgren household was not the mask which had been described by Ms. Rodda in the police reports, this fact would not entitle Smith to the relief sought. Again, the circumstantial case against Smith was overwhelming. The Court simply cannot conclude that the information concerning Smith's access to a mask, hypothesized to be that used in the robbery, constituted an important part of the prosecution's case. Certainly it would have been apparent to the jury that Smith could have obtained a mask, matching exactly the description given by Ms. Rodda in the police reports, from any number of sources. Accordingly, the Court concludes that there is no "reasonable possibility" that the use of the information in question would have affected the outcome of Smith's trial, *cf.* Barbee v. Warden, *supra,* at 847.

For the reasons stated, Smith's motion to alter or amend the judgment entered herein on September 20, 1974, will be denied.

An appropriate order shall enter.

## IV. Addendum

Finally, the Court would take this opportunity to point out that Smith has brought before it, now, three actions which essentially involved attempts at post-conviction relief. Smith v. United States, D.C., 364 F.Supp. 1145. The various claims raised in these three actions have been even more numerous. Among them have been allegations of: (1) *ineffective assistance of counsel,* C. A. No. 311–70–A–M, C.A. No. 450–72–A–M; (2) *illegal arrest and detention prior to trial,* C.A. No. 311–70–A–M, C. A. No. 450–72–A–M, C.A. No. 184–73–A–M; (3) *after-acquired evidence,* C.A. No. 450–72–A–M; (4) *insufficiency of*

evidence at trial, C.A. No. 450–72–A–M; (5) malicious prosecution, C.A. No. 450–72–A–M; and (6) suppression of exculpatory evidence (in the Fairfax County Police reports) by the prosecution, C.A. No. 450–72–A–M.

In addition, Smith is a litigant who refuses to accept a judgment once rendered. After the final decisions by this Court in C.A. No. 311–70–A–M and C.A. No. 184–73–A–M, Smith appealed those decisions to the Court of Appeals. Taking these appeals was, of course, entirely appropriate action, assuming Smith thought, in good faith, that he had grounds for reversal. However, since the Court of Appeals' decision upholding the judgment in C.A. No. 311–70–A–M, Smith has made repeated attempts to re-open that litigation in this Court. Indeed, C.A. No. 184–73–A–M was in its entirety an attempt to re-litigate an issue presented in C.A. No. 311–70–A–M —a rather frivolous claim that this Court erred in refusing to hold separate proceedings for Smith's two separate claims in C.A. 311–70–A–M, which had in fact been given separate consideration therein, although in the same proceedings. See Smith v. United States, C.A. No. 184–73–A–M, mem. decis., Nov., 1973 (E.D.Va., Alex.Div.). In addition, Smith has attempted to raise in this action, C.A. No. 450–72–A–M, some of the claims which had also been previously litigated in C.A. No. 311–70–A–M.

If the "finality of judgments" was ever an issue, it is so in Smith's case. The Court has been more than patient in wading through the mass of pleadings in the various claims which Smith has presented to the Court. This task has been rendered all the more difficult by Smith's practice, rather than consolidating his arguments into a single brief, of filing numerous "memoranda to the Court," sometimes almost daily, regarding each motion and issue pending before the Court. Indeed, these "memoranda" have, at times, been totally repetitive of one another.

The Court does not mean to suggest, herein, that Smith should not feel free to present all of his arguments to the Court, so long as he does so in some rational and non-repetitive manner. Nor does the Court mean to discourage Smith from bringing any bona fide "new claims" he may have before the Court for decision. However, as to any claims previously litigated, as referenced above, and as to the claim decided herein, this Court's judgment has been rendered. Absent a mandate from the Court of Appeals, should Smith decide to appeal the claims presented in this action, Smith should be forewarned that any attempt to re-litigate the various claims on which this Court has already entered judgment will be met with speedy rejection, absent cause shown